Architectural, I'm going to mispronounce this, Ingenieria Siglo XXI, LLC versus Dominican Republic Instituto Nacional de Recursos Hidrolicos. And Mr. Webster, you have reserved three minutes for rebuttal. You may proceed when you are ready. Thank you. Good morning. May it please the court. Benjamin Webster appearing on behalf of the appellant, Architectural Ingenieria Siglo XXI, LLC. I'm going to refer to my client as AIS for the rest of today for simplicity's sake. Your Honor, the district court found correctly that my client's construction contract had been wrongfully breached and that my client had been damaged as a result. But it made critical errors when assessing the liability of one of the two defendants appellees, the Dominican Republic itself, in assessing damages. Before I jump right into that, I do want to briefly touch on why we're here litigating this dispute over a Dominican Republic construction project that happened completely in the Dominican Republic in the United States court system. That's because when my clients signed the contracts at issue, they made sure those contracts stated that if there was ever a dispute, if the Dominican Republic ever broke the contracts, that they would have recourse in the United States civil justice system. That's why we're here. We believers. I have a more practical question. Yes, Your Honor. Honestly, it's more of a curiosity than anything else. What's this really about? In other words, you've gotten recovery against one party. Let's assume I agree with you that the Dominican Republic is liable under the contract, which is a big part of what your appeal is today. What's the practical reality of that? If I don't agree with you on damages, the damages will be the same. Your argument is they're the same entity anyway, so you're going to be collecting from the same party anyway. The amount is essentially the same for damages-wise. I'm having trouble seeing what it is other than attorney's fees, and that may be what it's about. Your Honor, that's a great question. Practically, there's a huge, huge distinction. First of all, because of the way the court assessed liability only against injury and not against the Dominican Republic, that led to a post-verdict, post-judgment set-off mechanism, which meant the $600,000 award that the court gave and all attorney's fees that the court gave were wiped out. My client is actually negative on the judgment. Because of fees that you owe on the other side. Correct. That's essentially what this is about. Well, that's a big part of it. Secondly, and this is really in the record, but you did ask for a practical aspect, is there's really no practical ability for us to recover against injury. This state entity that only operates in the Dominican Republic. Practically, there is a way to recover from the state itself. That's very important. Then obviously, the damages issue, which Your Honor touched on, which is we believe the court made some significant errors in only awarding the $600,000 as opposed to the damages we set forth in our brief. I think practically, there's a real big distinction. I didn't want to cut you off. I just was curious about that. For me, I'm personally most focused on the liability issues and why the Dominican Republic is not responsible. If you can talk about your dual theories there, the juridical theory and the direct cause theory. Yes, Your Honor. Absolutely. There's really three bases that the Dominican Republic should have been found liable for the breaches that happened. Two are direct liability theories and one is an agency principle theory. The first theory is that it's responsible for its own Congress's actions. The district court cataloged at length that the source of delays, and there was like six years of delays, construction delays in this case, was the Dominican Republic's Congress inability to get their financing in order. That was their obligation under the contracts at issue. I have to say, I'm befuddled by that argument, or not the argument, by what happened here. The district court finds that the Dominican Congress is responsible for the delay, but then says that that's not attributable to the Dominican Republic, right? Absolutely, Your Honor. So, was there any evidence at all as there was some evidence about where the instituto national falls in line in this government entity? So, that was well litigated, but was there any evidence about where the Dominican Congress comes into? Because the district court seemed to suggest that it's a lack of evidence issue, not a sort of logical issue that I think you and I would see that the U.S. Congress is the U.S. government. Sure, Your Honor. And there was. I mean, most of, actually, all of the contract documents that are in issue explain in detail who the Congress is and what their responsibilities are in terms of getting approval. There are the resolutions that were signed by the President and also the Congress that are in the record as well, in the trial court record, that describe who the Congress is and what they're doing. And who the Dominican Congress is, from a practical matter, is exactly who you think they are. They're a political subdivision of the Dominican Republic. We asked the court below and asked this court to take judicial notice of the Dominican Republic's constitution, which is something that this court can do. Did the district court do that below? Um, I don't know if the district court, I apologize, I don't know if the district court expressly did that. We certainly discussed it at trial. Did you, so you, you asked it to or, or presented it at least in some papers with the Dominican constitution? Your Honor. Any English translated copy of it? Your Honor, I'm, I'm not certain as I sit here today, whether the English translated copy of the constitution itself was part of the record. I believe it was, but I don't have that citation, uh, a top of a top of mind right now. Um, but there's been no dispute in this case, who the Congress was. It's, it's in many of the documents and was discussed with the witnesses at trial. And the court lays out in detail in its findings, who the Congress was and what it did and didn't do in terms of, it had to get, uh, meet certain conditions proceeding to get its financing. It didn't do that until the entire two year term. And what about, what about the presumption of separate and separate writtenness that was found, I believe by the circuit court in a previous appeal and found again upon the facts that the, the trial and the bench trial by the district court that you had not overcome this presumption of separateness between Dominican Republic and, and, and, and, and the INHR. I think that's a lot of letters. It is your Honor. But so if that presumption has not been overcome, what does it matter what the Congress of the Dominican Republic did? Because there would be no way to attribute the conduct against the Dominican Republic itself. If there's no, if there's, if the, uh, if, um, INHR, INHRA is actually just an instrumentality of the Dominican Republic. So don't you have to overcome that, that problem first? Your Honor, no. And that's a, that's a separate issue. And let me just. It is. But I think it, but, but I think you have to come back around to it. How are you going to hold the Congress liable unless there's something that tethers them to the conduct of the contractee that you had? Because the Dominican Republic itself, the state is a party to the contract. There's no dispute about that. And, uh, whether Congress's delays and getting the financing in order can be attributable to the Dominican Republic. It's just a matter of law. It's part of the Dominican Republic. The issue your Honor is asking about is the derivative liability issue, which is, is the Dominican state. Counselor, I think Judge Sands is asking the same question. I think he's just applying the law that you were discussing with regard to the instituto national to the Congress, but it's the same thing. It still is a constituent part of a larger, in other words, there's a government and it's made up of a lot of things. Right. And there are a bunch of constituent parts to it. One here is the issue of whether the instituto national is part of it. But the other, I think Judge Sands is asking, and I have the same question is the Congress is too. And there still is a presumption that goes to that constituent part and it's still the burden of the plaintiff to overcome that presumption. So I, I think the question, I don't want to speak for Judge Sands, but the question would be what evidence is there to overcome that presumption in this record other than just please take notice of the constitution. Your Honor, and I think we're skipping this. I appreciate the question. I think we're skipping a step. The presumption of jurisdictional separateness applies when you're trying to find whether an instrumentality of a government, uh, the government's liable for the instrumentality of conduct. Injury is an instrumentality of the government. It's not a political subdivision. The core functions test, which is outlined in our brief talks about when a political subdivision is part of the government or an instrumentality. And there's been no argument ever in this case that the Congress is an instrumentality of the Dominican government. It's just a political subdivision. That's been the argument in the record since day one. Um, they do dispute vehemently that injury as an instrumentality of the Dominican Republic that we did not overcome the presumption of a jurisdictional separateness, which is what Judge Sands pointed to. And respectfully, the trial court simply rejected or ignored all the unrebutted, uncontradicted evidence of control of the Dominican Republic and did so without any commentary on it at all. It just said we didn't overcome the presumption. When you look at the record in terms of the DR's responsibility for injury, the unrebutted facts are that it controls injury 100%. It provides 100% of the funding to injury. Injury has no separate financial existence. It doesn't generate revenue. The Dominican president appoints the entire board and the executive director that serve at its pleasure. And if you look at the specific control on this project, I think this is important. On this project, whether injury was an agent of the Dominican, which is the legal test. It's not day-to-day control as set forth in the appellee's brief. It's agency under this court's precedence. If you look at the facts, injuries representative, Mr. Jose Duran, testified at trial. And I quote, injury is a Dominican state entity acting on behalf of the Dominican state. The protocol, which is the main contract that issue, literally says injury is acting in the name of and in representation of the Dominican state. Injury has been instructed by, we call it STP, but it's the technical secretary of the Dominican Republic. Their representative has been instructed to serve as the governmental entity in charge of the project. So the evidence is overwhelming that injury both generally is controlled by the Dominican Republic president and specifically on this project was their agent. And we think the district court erred by rejecting that without any commentary at all. I'm running a little low on time. Not any commentary at all is something that I'm curious about. Let's assume, so as I read the Republic of Yemen case, which really is, I think, our seminal case in setting out what the test is, there seems to be some factors that a court needs to consider in determining whether one has control over the other for purposes of the agent-principal relationship. The court, at least in the conclusion section, is pretty conclusory in just saying there's no absolute control or no complete control, I think was the term that the district court used. If we were to find that that is sufficient, should we send it back for the district court simply to make the findings on the record that's been established or should we make those findings ourselves based on the arguments that you're making to us now? Your Honor, I think this court can make those findings itself because the record's fully established. There's a bunch of evidence on all of the factors and all of it is unrebutted. There's no contradictory testimony to the evidence that I just set forth. So this court has a full record. And I think that points on something that is related to the last liability issue, which is the law in this circuit is that a trial court judge cannot or should not just throw away unrebutted, uncontradicted testimony. That's not supposed to happen in the trial court. And that's what happened with regard to the jurisdictional separateness issue. But more importantly, I think, and this is very important, the direct liability of the Dominican Republic, the evidence is uncontroverted from five different sources at trial. It wasn't challenged in any way that the Dominican Republic's president ordered the termination of this contract. The district court found that that was hearsay and unreliable evidence. Yeah. And that really highlights the abuse of discretion that happened. Six months after trial, six months after the evidence came in with no objection because it's not hearsay, it's admissions, and it went into evidence, was actually admitted. Six months later, the district court issued a finding. Counsel, some of it is hearsay. I mean, the USU report is absolutely hearsay. The bank official who says, I have no firsthand knowledge, but I heard this, is hearsay, right? That's hearsay. Well, and respectfully, he said he does have firsthand knowledge. He attended the meetings with the president, Mr. Fancher, I believe you're referring to. And he said over and over again that the Dominican president killed this deal. But even that hearsay, I agree that it is hearsay. What the president indicated was he did not like Sundland. And so, I don't like Sundland means kill the deal? Well, it was two parts. I see I'm out of time. I want to answer this question. Each of the three witnesses testified that the president told them, either he's canceling the deal, killing the deal, or in the Utah State Memorandum, it's freezing the deal. There's a whole bunch of different words used. And here's what's important about it. None of it was even challenged. They didn't ask a question on cross. A witness didn't show up and say that's not true. There's not a document that says not true. Completely unchallenged. Five sources of evidence. And the district court just rejected it. Six months after trial. There was no hearsay objection at trial, correct? Absolutely none. Respectfully, I don't believe any of it is hearsay. At least most of it. And what the district court did six months after trial, it issued an opinion saying it was inadmissible hearsay. It was already in evidence. You don't go back six months after trial and remove things from the evidence room. We think that kind of highlights what happened here. I see I'm out of time. Thank you. You have reserved time for rebuttal. Thank you, Your Honors. Mr. Baldwin. Good morning, Your Honors. May it please the court. My name is Greg Baldwin. With me at council table is my colleague Eileen Pabian. We are partners with the law firm of Holland and Knight. And I also want to point out that the Dominican Republic is represented by its legal counsel to the presidency, attorney Roger Pujols, who is in the audience. And Iju is attending through its attorney representing the board of directors, Mr. Peña-Castillo. Your Honor, the first question that you raised, Judge Luck, was in reference to the responsibility of the DR and whether the DR should have been held liable. First of all, the district court here never found that the Congress had committed any errors or was in blame for anything at all. Quite to the contrary. Counsel, didn't it find that the delay was attributable to the Dominican Congress? No, sir, it did not. And you can go through the record from the very beginning to the very end, and it never said that. Not at any point. This is a fantasy on the part of AIS. It is not in the record. They raise a bunch of bullet points and some evidence, all of which is the court either considered unreliable or not credit worthy or not worthy of any weight. And I can go through each of those if you would like. But the point is, the premise for this argument, that the Congress was found responsible and therefore the Dominican Republic is responsible, is absolutely a false premise. It was not found. And the evidence does not support it. And we addressed this in our brief, I think, pretty thoroughly. But that is the bottom line of it. Now, as for judicial notice, whether or not one branch of a foreign government is responsible for the acts or omissions of another branch of a foreign government is a question really of foreign law. Mr. Webster said that they requested judicial notice. You can search through the record. They never requested it at any point in time. The only time judicial notice ever came up in this case was when AIS filed its motion to amend the findings of fact and conclusions of law. That was post-trial. And it was a new issue that was raised. It was improperly raised. This court has held that several times. Rule 52 and Rule 59 are not vehicles for introducing new evidence that was available at the time of trial. It's not available for new theories that were available at the time of trial. What it did is it simply said, take judicial notice. Here's the Constitution. That's it. Now, what's wrong with this? First of all, if you're going to prove foreign law, the rules of procedure require notice to the opposing party. No notice was ever given until after trial, even assuming and giving them the benefit of the doubt that their motion constituted notice. But second, under Rule 44, they have to request judicial notice, and they have to back it up with sufficient information to give the court an idea of what it is they argue. All they did was they presented the Constitution with no treatises, no explanation, no expert affidavits saying what it is. They then say, the Constitution says, look, there are three separate branches. Therefore, they're all responsible for each other, and they're all liable for each other's acts and omissions. And that simply does not follow. It doesn't work. That's not how you prove whether the branch of a foreign government is responsible for another separate branch. All it establishes is that they're separate branches. It's not the separate branch, counsel. It's that a decision of the Congress is a decision of the country. If the Congress decides to delay for two years the ratification of a contract, that is attributable to the nation in which the Congress is making a decision for, is it not? Yes, but it's not attributable to the Dominican Republic in terms of liability. Because the district court... You said yes to the answer to my question. There's no way you can say what you said after the yes. So if the answer is yes to my question, then the decision of the Congress is the decision of the country. No, what the Congress does is it passes laws. It doesn't make decisions in the sense that you're referring to. This contract specifically required ratification by the Congress. That is a decision by the Congress. Yes, it did. Congress chose not to ratify. Yes, it did. And if the acts of one branch bound the acts of the other branch, then there would be no reason to require the ratification because the ratification would be confirmed. I know, but if we're asking who is responsible for the delay, doesn't the action of the Congress in delaying ratification attributable to the nation in which the Congress acts on behalf of? Well, assuming only for the purposes of argument, yes. The premise is wrong. What's the premise? The premise is that the court found that the Dominican Congress was responsible for the delay. Page 24 of the findings of fact, docket entry 2210. Plaintiffs argue that the Dominican Republic failed to secure approval of the credit agreement or amendment three in a timely manner and was an improper stop and start. As an initial matter, there is no evidence that the Dominican Republic, meaning the nation, had any control over congressional ratification of the credit agreement. How can the country not have control? How can this Congress not have control of the country or the country have no control over the Congress? It's the same thing, aren't they? No, sir. What the judge is saying is that the Dominican government doesn't control the Dominican. There's no such thing as Dominican government. They're not in front of us. There is an executive. Counsel, counsel, counsel. The only people that are in front of us is the country of the Dominican Republic. Does it not speak through its Congress? No, sir, it does not. What evidence do you have in the record to suggest that that's the case? Well, it's not our burden to establish that in the first place. I think it's AIS's burden. But in the... I just want to be clear. Are you telling me that I can't look at the Dominican constitution to answer that question? I'm not allowed to? No, sir. I wouldn't say, I would never say you're not allowed to. In fact, rule 201 says I am allowed to, right? But it was never properly requested below, and the court did not consider it because it wasn't properly requested. Rule 201 allows a court to take judicial notice of... Yes, sir. Okay. But it did not. It did not take judicial notice to respond. It didn't even address the issue in its order relate in denying the motion to amend where this first appeared. But the court did find that the Dominican Congress delayed and did find that the Dominican Congress is not, does not speak for, is not responsible to... No, your honor, it did not. What the record shows... I'm not talking about the record. I'm talking about the findings of the district court. I just read it to you. It's page 24 in its conclusions of law. How can that be anything other than a finding, A, the Congress was the one that delayed, and B, that that is not attributable to the Dominican Republic? Because that's not what the court is saying. The court heard testimony that the problem with the ratification, which occurred three times, was caused more by Ex-Im Bank than it was by anybody else. By way of example, the first ratification by the Congress of three of the same document, the first ratification took place within about a month of the signing of the issuance of the credit agreement. It took Ex-Im Bank five months to get around to saying this isn't good enough. When they went to the second ratification... Counsel, let's go to the findings of fact. Docket entry 210 at page 9. On March 3rd, 2003, the Dominican Congress ratified the credit agreement. That's two years after it was initiated or signed, was it not? Yes, sir, but I'm trying to explain the reasons why it took the two years. It could have been that a congressman was sick. It could have been they didn't feel like dealing with it. It could be any number of things. But the question is, does the Congress speak for the country? The Congress speaks for the country when it makes a law or when it issues a ratification of a document. Right. But it does not speak for the country otherwise any more than anything else speaks for the country. So nobody does? Well, no, I don't think so. I think that the Dominican government might represent the Dominican government and its executive branch and the policies of the government. Is the statement by a Dominican president hearsay? It depends upon what the statement is in the context, but if... Party opponent admission, is it not? What you're getting at is that did the president... Counsel, answer my question first. Is it a party opponent admission? It could be, yes. I can't say, I can't say blanket yes or no. It almost always is. It doesn't have to be contrary to the evidence. The Dominican president is an agent of the party opponent to the plaintiff. It just depends if that it's relevant and that it's pertinent to the case. Sure. It could be, yes. So the statements here were that they were unhappy... That the Dominican president was unhappy with Sunland? That's right. And wanted to kill the deal? No, that's not what he said. Okay, what did he say? No, you're talking about the testimony of Mr. Morales. Mr. Morales said that he ran into the president. They had a brief discussion. The president said to him that Sunland is not a good companion for you in this venture. And that the Dominican state is going to go along or abide by injuries termination. The termination of this contract had happened two months before this meeting. So the president did not say, I terminate it. The president did not say, I'm going to terminate. He simply said, I'm going to go along. The Dominican executive, the state, is going to go along with what injury has decided. And that's a termination. So it's a far cry from the president canceling the contract. What would the president have to say to have been responsible for terminating the agreement? He would have to say, basically, I terminate it. Or I directed injury to terminate it. And it terminated it. But he did not say that. So no inference can be drawn from, I don't like these guys and I'm going to kill the deal? An inference probably could be drawn. But I don't think it would be well supported by the facts of the case. And I don't think it would survive an examination for clear error. That may be true. But the problem is that's not what we have. In other words, what the district court, as I read the district court's findings, didn't say, I've heard the evidence and don't find it credible. Or I find the weight of the evidence to be this as opposed to that. I agree with you if that were it. But what the district court said here is that statement's hearsay. And, therefore, it is not admissible and not a basis to be able to make a finding. The court said it was hearsay. The court said it was inadmissible hearsay. But it was admitted. The court did not unadmit it. By no stretch of the imagination. Isn't the finding that it's hearsay and inadmissible a determination that the court didn't consider it? No, sir, because the court said it did consider it. It said that in its ruling in docket entry 232 on the motion to amend. It said that it had considered all of the points that had been raised by AIS, including that one. And the bottom line is, whether admitted or not, if it's hearsay, it's hearsay. It doesn't become non-hearsay because it's admitted. That's not how I read rule 801 D2, which specifically says a statement of a party admission is considered not hearsay. Well, it's considered as an exception. No, no, no, no, no. One way or the other. Counsel, counsel. Rule 803 is the exceptions to the hearsay rule. Rule 801 is the definition of hearsay. It is excluded from the definition of hearsay, a party opponent admission. Well, whether he called it hearsay correctly or not, the bottom line is that he did not give it any weight or credibility because of the circumstances under which these statements were made. And these statements were, for the most part, by the way, contradicted by other evidence. AIS complains that the court had to accept all this because there was no testimony. But that's not what the rule is. And this goes back to the Supreme Court case in 1898, Kwok Ting versus the United States, and reaffirmed by Republic Bank versus Roka, which are both in our brief, where the courts both said it does not have to be testimonial evidence that rebutts other evidence of what apparently looks like unrebutted evidence. It can be rebutted by other evidence that's in the record. It doesn't have to be testimonial. And in all of these things, in each one of these statements, there is evidence that rebuts the statement. There's no doubt that that's true. I don't disagree with that. But what we have here, and I'll read it, it's from page 14 of Docket Entry 210, the conclusions of law. This hearsay evidence, the one that we're discussing, of the Dominican Republic's role in terminating the contract is exactly that, hearsay. And that's insufficient to support the finding that the Dominican Republic breached the contract. If that's error, how are we not required to have the district court consider that hearsay? And it may be what you said, which is it's rebutted, and I don't find it to be credible. But isn't the district court required to consider it? But it said it considered it, Your Honor. It said it in the motion for, or in its order, denying the motion to amend the facts. No, what you just quoted was a statement that you made all these arguments, and I considered all these arguments. That's not a statement of I considered this evidence as not hearsay, and I found that they were not credible, and that's why I made the finding I did. But, Your Honor, all he's saying, he's not making a legal ruling. All the district court was doing was giving a reason why he's not giving it a lot of weight or credibility because it is, in fact, a statement by a third party. Did the district court, in your opinion, weigh the actions of the Export Bank and its impact and the delay as compared to what the Congress did? Yes, Your Honor. I think it clearly did, and I think that's one of the reasons why the Dominican Republic was found not liable. And it did that on the basis of the testimony of Steve Fancher. Steve Fancher was present in the entire financing process. From the beginning to the end, he worked directly with Ex-Im Bank. And what he said, basically, was that virtually all of the delay in getting the financing was caused by Ex-Im and the Ex-Im problems and Ex-Im attorneys. They were nonresponsive. They took too long. They lost documents. They were just difficult to work with. They went on long business trips. They were inattentive to this file. He was not only testified very thoroughly about this entire process, including the amendments, but he also testified that the Dominican Republic did not do anything to delay the process of either the credit agreement being ratified or the amendments being signed or put into effect. Thank you. Mr. Baldwin, if you could just wrap that up. You have gone over. Oh, I'm sorry, Your Honor. If you could just wrap up your answer. Well, wrapping up the answer is that, basically, contrary to what AIS says, Steve Fancher never blamed the Dominican Republic at trial in his testimony except for two things, both of which he had contradicted himself on in his direct testimony. In other words, once he said there was a delay of 94 days to November 2004, he said that didn't impact the financing at all. He admitted that there was a delay of six months in getting amendment number two, and he said that was the fault of the Dominican Republic. But in his direct testimony, he said the reason we needed amendment two is because the bank and Ex-Im Bank both got the amount of the loan incorrect. And introduced to his testimony was an exhibit, which was a letter from Ex-Im to the Dominican Republic admitting that it was their mistake. All right. Thank you, sir. Thank you, Your Honor. All right. Mr. Webster, you have three minutes on rebuttal. May I proceed? Please. I want to address Judge Sand's question real quick. The last question you had, which was, did the district court weigh any issues by Ex-Im Bank against the issues caused by the Congress? And the answer is, it absolutely did not. If you look at the findings of fact, it found pretty conclusively that the delays were solely bureaucratic delays on the part of the Congress. This notion that Ex-Im Bank caused some delays is simply not what the district court found. What we're here on this appeal about is the legal consequence of those findings. Once the court found that Congress caused the delays, the legal consequence, we believe, is that the Dominican state is responsible for that. I want to move on to briefly on to the issue of direct liability because of the Dominican Republic president's actions. Once you move past the four different sources of evidence that the Dominican Republic president personally canceled this contract, and he didn't say, I go along with injury. He said, we will do no further work with you, or cancel, or freeze, are the words he used, according to the testimony. Once you move past that, there's something really important here I want to make sure doesn't get lost. The purchase agreement signed in 2011 at a 12-year term, meaning it was supposed to be viable until 2013. In 2011, and this is uncontradicted in the evidence, in 2011, the Dominican Republic president ordered injury to give my client's project, after they'd been terminated, away to a Brazilian company for $90 million. They received an immediate down payment of $19 million. That happened in 2011. If the Dominican Republic didn't terminate this contract, they gave my client's contract away two years before it was over for $90 million. I think the logical problem that the appellees have is they want to say, and they say this in their brief, injury terminated the contract, so then the Dominican state was allowed to give it away. Well, if you can rely on your partner's termination of a contract to avoid any responsibility under the contract, then we didn't have a contract at all. If injury terminated the contract and only injury, and the Dominican state wasn't involved in the termination, then they gave my client's contract away for $90 million before the term was over. That in and of itself is a pretty significant breach of the contract, and I didn't want that to get lost in the shuffle. I want to touch on one damage issue, and I won't go through all of them because we don't have time. That's the delay issue, the delay damages. It can be called looking backwards, lost profits, the difference in what you were supposed to get versus what you got. There's no dispute in this case that there was significant delay. There was 1,021 days of on-site delay, no dispute. My client was on the job waiting for instructions for over 1,000 days. There was 2,410 days of delay in total. That's over six years of delay. My client wasn't on the job site the whole six years, but that was the delay. No dispute about that. No dispute my client didn't cause any delays, and they were awarded $0 for all of that. All of the evidence about what they spent during those years waiting for project instructions is in the record, and we believe that needs to get fixed. Thank you for your time. Thank you. Thank you both.